## Commonwealth *v.* Reina, Appellant.

Argued March 18, 1958. Before RHODES, P. J., HIRT, GUNTHER, WRIGHT, WOODSIDE, ERVIN, and WATKINS, JJ.

Before DAVIS, P. J., specially presiding.

*Michael von Moschzisker,* with him *George F. Coffin, Jr.,* for appellant.

*Edward G. Ruyak,* District Attorney, with him *Andrew L. Herster, Jr.,* Assistant District Attorney, for appellee.

OPINION BY ERVIN, J., April 16, 1958:

This is an appeal from the judgment of sentence imposed by the court below after a jury found the defendant guilty of involuntary manslaughter. The case arose out of an incident which occurred on June 10, 1955, in which the death of Lewis Nunn was caused after he had twice shouted an obscenity at defendant while the latter was driving by with his young son in the lad's pony cart. The Commonwealth's evidence was that the defendant jumped out of the cart and came directly across the street to where decedent was and gave the decedent an uppercut which caused him to fall over backwards and strike the back of his head on the sidewalk. Shortly thereafter the defendant and a patrolman tried to help the decedent but he slipped from their grasp and bumped his forehead upon the pavement. The post-mortem examination revealed that the cause of death was a cerebral contusion and that the lesion which directly contributed to death was the major one on the back of the head. There was a fracture of the skull which started at the back of the head and went forward. The witnesses for the Commonwealth and for the defense contradicted each other on the following issues: (a) whether the defendant jumped from the pony cart and hurried directly across the

street, and assaulted the decedent as soon as he reached decedent; or whether defendant alighted from the pony cart and, proceeding at a normal pace at all times, walked to the corner of Sixth Street and Northampton Street, pausing there to watch his boy and talk to Hahn, then walked down to Herster Street, pausing to watch the boy again and talk to DeWees, and then walked over to decedent when decedent and Anthony called him. (b) Whether defendant struck decedent although decedent had not raised his hands from his side or made any other movement; or whether defendant threw a block with his hand or arm after the decedent brought his arm up as though he was going to strike the defendant an uppercut blow. The jury by its verdict resolved both of these questions against the defendant.

The first contention of the appellant is based upon the following exception to the court's charge: "I further except to his Honor's statement to the jury that the question as to who was telling the truth, and they were to determine who was telling the truth; I except to that for the reason that I think if they don't believe either side, they can still reach a verdict without determining who was telling the truth." The defense relies principally upon the case of *Com. v. Colandro*, 231 Pa. 343, 350, 80 A. 571, to sustain its position. In that case the Court said: "It was error to tell the jury that self-defense was the only issue, and to eliminate the possibility of manslaughter; and again, it was error to say that it was necessary for the defendant to satisfy the jury that his version of the shooting was correct. In a murder case the jury are not bound to accept the version of the commonwealth or that of the defense; it is their duty to consider all the testimony and to make up their minds therefrom as to the facts. It was possible in this case that the jury might have found

that there was a certain amount of truth in the evidence produced by the commonwealth and some truth in that produced by the defense, but that neither side was wholly to be believed. On this theory, the jury might have believed the story of the threats to take defendant's life, and that he was put in great fear by such threats; that when he saw Rocco coming toward him it raised a passion of terror in his mind, and he shot under the control of that passion. Yet, at the same time, they might not have believed that Rocco had crossed the fence and advanced as far as the defendant's kitchen door, or that he had actually fired pistol shots into the room. Under such a state of facts the prisoner would have been guilty of manslaughter and not of murder." Appellant also cited the cases of *Com. v. Marcinko*, 242 Pa. 388, 89 A. 457; *Com. v. Miller*, 313 Pa. 567, 170 A. 128; *Com. v. Flax*, 331 Pa. 145, 200 A. 632; *Com. v. Steele*, 362 Pa. 427, 66 A. 2d 825. An examination of these cases will reveal that in each case the defendant was being tried on a murder charge. The court took away from the jury the opportunity of finding the defendant guilty of manslaughter. This may not be done under the law of this Commonwealth. That was the real error which the appellate court was endeavoring to correct in each of those cases. What was said by the appellate court as to the right of the jury to disbelieve all or any part of the testimony presented by the Commonwealth or the defendant must be related to the major problem there being considered, to wit: the right of the defendant to have the jury consider the lesser offense of manslaughter. Counsel have not presented to us and our research has failed to reveal any case where this principle has been applied other than in a murder charge. In the present case the defendant was charged with only one crime, that being involuntary manslaughter; a misdemeanor. Only

one of two verdicts was possible—either a verdict of guilty or a verdict of not guilty. We do not understand how the jury could totally disregard the evidence on both sides and arrive at a sensible conclusion. If it disbelieved all of the evidence of the Commonwealth, it would necessarily have to find a verdict of not guilty but in such event it would certainly have to find that some or all of the evidence of the defendant was true. If it disbelieved all of the evidence of the defendant, it would necessarily have to find some or all of the evidence of the Commonwealth to be true. This is not so in a murder charge. There it is possible to disbelieve all of the evidence on both sides as to the murder charge and still find sufficient facts to warrant a conviction of manslaughter. We have carefully reviewed the charge of the court below and are of the opinion that it was entirely adequate.

Complaint is also made by the appellant that the court below in its charge failed to tell the jury that they should reconcile the contradictions in the testimony if they could fairly and satisfactorily do so. We agree that it would have been better had the court below done so but the defendant did not except to the court's failure to do so nor did he present a point on the subject. This was not fundamental error and therefore we do not consider it of sufficient importance to necessitate the granting of a new trial. Furthermore, we do not believe that the two stories in this case could be reconciled. It should be pointed out, however, that while the court did not expressly charge the jury to reconcile the conflicting evidence if it could, it did actually instruct the jury quite thoroughly as to what it should take into consideration in determining the credibility of witnesses. The court, inter alia, said: "The law says that if you find that a witness is not truth-telling in a material part of his or her testi-

mony, wilfully and deliberately, you have a right to disregard that witness' testimony in its entirety. On the other hand, the rule is permissive, and the law says that if you find that a witness is not telling the truth in a material part of his or her testimony, wilfully and deliberately, that you can disregard that testimony which you do not believe and take into consideration that testimony which you believe to be truthful. It is within your discretion whether to disregard all of the testimony of a witness if you find there has been wilful, deliberate untruthfulness in relation to an important matter; that is something that is within your own discretion."

Complaint is also made that the court below did not charge on the weight of negative testimony as against positive testimony. We could also dismiss this subject, there being no exception to the failure and no point having been presented to the court below relating to the subject. While there have been many cases in this state involving so-called positive and negative testimony (*Costack v. Pa. R. R. Co.*, 376 Pa. 341, 347, 348, 102 A. 2d 127) we believe that the subject has been unduly emphasized. We thoroughly agree with the sentiments expressed by Mr. Justice MAXEY in *Kindt v. Reading Co.*, 352 Pa. 419, 424, 43 A. 2d 145, as follows: "It is impossible to lay down any rule by which it can infallibly be determined that a witness' statement that 'no whistle was blown and no bell was rung' is of so positive a character as to support a charge of negligence, or is of such negative character as to 'amount only to a scintilla.' The question whether such testimony is 'positive' or 'negative' *is, except in clear cases, for the jury,* for the weight to be accorded to such testimony must depend on the keenness of the witness' perceptions and the circumstances under which they functioned." We also reaffirm the lan-

guage of our brother Judge HIRT in *Taylor v. Reading
Co.*, 149 Pa. Superior Ct. 171, 173, 27 A. 2d 901, where-
in he said: "Plaintiff testified that after he left the
stop sign he was 'watching and listening all the time'
but saw and heard nothing. He was in position both
to see whatever was visible and to hear, and his testi-
mony cannot be regarded as negative merely; it was
positive in quality and sufficiently definite to take the
case out of the negative testimony rule applicable to
railroad crossing accidents. Anspach v. Phila., Etc.
Ry. Co., 225 Pa. 528, 74 A. 373; Engleka v. B. & O.
R. R. Co., 136 Pa. Superior Ct. 388, 7 A. 2d 734. The
statement of a witness, though negative in form, may
be positive proof of the non-existence of a thing or of
an occurrence. Simons v. Phila. & R. Rwy. Co., 254
Pa. 507, 98 A. 1080." Our position is also further for-
tified by what was said on this subject by Professor
Wigmore in his monumental treatise on the Law of
Evidence: "In applying the foregoing principle requir-
ing that the witness' inferences be based on adequate
data, Courts have often been asked to exclude testi-
mony based on what may be called *negative knowledge,*
*i.e.* testimony that a fact did not occur, founded on the
witness' failure to hear or see a fact which he would
supposedly have heard or seen if it had occurred.

"Yet there is no inherent weakness in this kind of
knowledge. It rests on the same data of the senses.
It may even sometimes be stronger than affirmative
impressions. The only requirement is that the witness
should have been so situated that *in the ordinary
course of events he would have heard* or seen the fact
had it occurred. This sort of testimony is constantly
received,—particularly in proof of the failure to give
railroad signals, the loss of a chattel, the absence of a
witness, the non-existence of a fictitious person, the
non-payment of money, and other negative facts.

"Nevertheless, from some source not traceable, there lingers in the judicial mind, in many quarters, an antiquated notion that *negative impressions are not so probative* as affirmative impressions; and a charge to the jury often embodies that notion, where the witnesses differ. The truth is that the conditions affecting correctness and fullness of observation are so numerous and varied that the one under consideration has a negligible or minor status. Modern psychology sneers at the law's crude assumption that the complexities of human perception can be handled by some rules of thumb about negative testimony or the like." Wigmore on Evidence, 3d ed., Vol. II, §664. Furthermore, much of the Commonwealth's evidence was not negative in form. Officer Paul testified as follows: "Q. Where were his arms? A. At his body—around his pockets; I didn't see anything waving akimbo." Again: "Q. Where were his arms? A. At his side." The testimony of Mr. Anthony, who stood beside the decedent, was: "Q. Where were his hands at that particular time? A. Right alongside of him; I don't know whether they was in his pockets or out,—I don't know. Q. Did he make any motion with his body at all? A. No." The testimony of Walter Miller was: "A. He didn't do nothing that I saw. Q. Where were his hands at that time? A. His hands were at his side when I saw him. . . . Q. From the time Mr. Reina left the cart and until the time he approached Mr. Nunn, did Mr. Reina stop to talk to anybody? A. No, he didn't that I saw —he did not. . . . Q. In all fairness, Mr. Miller, when Mr. Reina's arm came up, attracting your attention, you weren't paying attention to Nunn's hands then? A. I was looking right down into them."

Appellant also contends that the court's charge with respect to legal causation was insufficient in that the court failed to charge that the jury must find, in or-

der to return a verdict of guilty, that the defendant committed an unlawful act which was the proximate cause of the decedent's death. We can find no reasonable basis to sustain this complaint. The court below. charged as follows: "So the Commonwealth here says that the Defendant committed an assault and battery —it says that from the testimony of Mr. Miller and from the testimony of Officer Paul—they testified that the Defendant threw out his arm in an uppercut fashion, that he touched the body of Lewis Nunn and that he knocked him down, and as he was falling down he knocked his head on the flagstone pavement, causing an injury to the back of his head which, according to the testimony of Dr. Chidsey, was the major cause of his death. The Commonwealth contends that on the testimony of other witnesses who demonstrated that the Defendant used his hand toward Mr. Nunn, and that Mr. Nunn as the result of the application of force by the Defendant, fell on his back and hit his head, causing a brain injury which resulted in his death." Later on in its charge, the court below said: "As we have said to you before, of course for this Defendant to be found guilty, you have to find that the death of Mr. Nunn resulted—was the result of the Defendant's unlawful act; if the death came as the result of something other than the unlawful act of the Defendant, then, of course, he would not be guilty." We have no doubt that it was crystal clear to the jury that the unlawful act had to be the legal or proximate cause in causing the injury which resulted in the death of Mr. Nunn.

Complaint is also made as to the failure of the court below to approve defendant's 5th point for charge, which reads as follows: "5. Mr. Bracken testified that his wife was with him when he witnessed the incident between Mr. Nunn and the Defendant. Under these

circumstances it was the duty of the District Attorney to do either one of two things. He should either have called Mrs. Bracken to the witness stand or he should have notified the defense that he would not call her to the witness stand. From the failure of the District Attorney to do either one of these things, you may infer that if Mrs. Bracken had testified her testimony would not have been helpful to the prosecution, (and she would have testified in accord with the Defendant)." We agree with the disposition of this complaint which was made by the court below in its opinion, as follows: "Commonwealth's witness Bracken testified that he and his wife were walking up Northampton Street on the south side between Sixth and Seventh Streets to go to their car when he saw the occurrence related in his testimony. The record is silent as to what the wife was doing at this time other than walking up the street with her husband. From this bare record may we presume that the wife also saw what was happening on the opposite side of Northampton Street, a wide and normally busy street? We think not. We believe the more reasonable presumption would be that she was looking ahead in the direction she was walking. Feeling that the record did not disclose evidence from which we could reasonably conclude that the witness saw the affair we thought that the instruction would be improper." The record does not reveal that Mrs. Bracken saw the happening nor does it reveal that she was "informed." Furthermore, the failure to approve this point would not, in our opinion, constitute fatal error. In *Bayout v. Bayout*, 373 Pa. 549, 556, 96 A. 2d 876, the Court said: "However, failure to produce an informed and competent witness permits only a factual inference and is not a presumption of law. Standing alone it would not warrant this Court in disturbing the order of the court be-

low." In some of the cases cited by appellant the presumption was employed, not against the one having the burden of proof but against the one in whose favor the witness would most likely have testified had he been produced. In *Ginder v. Bachman,* 8 Pa. Superior Ct. 405, which was an action for breach of promise of marriage, the presumption was used against the defendant. In *Pierpoint v. Pierpoint,* 108 Pa. Superior Ct. 108, 164 A. 808, which was a divorce action, the presumption was used against the respondent. Whether Mrs. Bracken did or did not see the occurrence, the district attorney is not required to call all of the witnesses of the occurrence. Much is left to his discretion under the general direction of the trial judge: *Com. v. Deitrick,* 221 Pa. 7, 70 A. 275. While it does not appear of record, and in most cases it would not, the district attorney in his brief states that he advised the court and counsel for the defendant at side bar that according to her husband, she did not see or hear the occurrence. Under these circumstances it would be ridiculous to compel the Commonwealth to call such a witness and, upon its failure to do so, to permit the defense to take advantage of the situation. There was no reason why, in this particular case, the defendant could not have subpoenaed and called Mrs. Bracken as his witness if he cared to do so.

We are convinced that the defendant had a fair trial and that his conviction was proper.

Judgment of sentence affirmed and appellant is ordered to appear in the court below at such time as he may be there called and that he be by that court committed until he shall have complied with his sentence or any part of it which had not been served at the time this appeal was made a supersedeas.